COUNTY OF BERGEN, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted October 28, 1975—Decided November 26, 1975.

Before Judges LYNCH, ACKERMAN and LARNER.

*Mr. Michael J. Ferrara,* County Counsel, attorney for appellant (*Mr. John J. Langan, Jr.* on the brief).

*Mr. William F. Hyland,* Attorney General, attorney for respondents Board of Public Utility Commissioners, Department of Public Utilities (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Bertram P. Goltz, Jr.,* Deputy Attorney General, on the brief).

*Mr. Stanley C. Van Ness,* Public Advocate, attorney for respondent Division of Rate Counsel (*Mr. William Gural,* Director, Department of Public Advocate, Division of Rate Counsel, of counsel and on the brief).

The opinion of the court was delivered by

LARNER, J. A. D. The County of Bergen operates refuse disposal sites in Lyndhurst and Ridgefield Park[1] which are available to Bergen County municipalities, private garbage contractors doing business in the county, and Bergen County residents. In prior litigation it was determined that the county's operation of the disposal sites is subject to the jurisdiction of the Board of Public Utility Commissioners (Board) in accordance with *N. J. S. A.* 48:13A–1 *et seq.* *Bergen Cty. v. Dept. of Pub. Util.,* 117 *N. J. Super.* 304 (App. Div. 1971).

The latter case also dealt with an escrow fund consisting of rate increases collected from customers pending that litigation. The court entered an order continuing the escrow until the Board determined the reasonableness of the rate increase which had been unilaterally imposed by the county without prior Board approval.

The county thereafter petitioned the Board for retroactive approval of the increased rates which were effectuated in January 1971. After public hearings before the Board's hearing examiner the latter filed a report dated January 17, 1974 recommending a denial of the application. Exceptions were filed by the applicant and on April 25, 1974 the Board rendered its decision substantially adopting the recommendation of the examiner. The order denied the rate increase and directed that the county "revert to the rates that were being charged prior to January 1971" and refund from the escrow fund the excess collected from customers subsequent to that date.

---

[1] We understand that the Ridgefield Park disposal site has been closed during the pendency of this appeal.

The County of Bergen appeals from that order, contending that the denial of the rate increase was erroneous because the Board failed to take into account as expense items annual amortization figures based on the cost of acquiring the Lyndhurst site and the cost for site preparation at both locations.

The Lyndhurst site was purchased by the county in 1964 for the sum of $420,000. The county asserts that this cost should be included as an expense item on an amortization schedule over a period of 17 years — the life of the bond issue authorized to finance the purchase. The cost for site preparation is estimated at $792,231 and involves various construction costs to make the land suitable for the intended use. The county sought to amortize this cost over a period of 10 years, allocating $79,231 a year.

Without these two items sought to be deducted as an expense, the records of the county reflect that the operation would have produced a profit for 1970, 1971 and 1972 at the rates in effect prior to the January 1971 increase. If these depreciation items are considered as an expense, there would have been a loss of $139,379 in 1970, a profit of $28,838 in 1971, and a loss of $93,700 in 1972.

The county administrator testified that the rate increase was arrived at without cost studies or analyses and purely on a review of the budget and an effort to recapture losses incurred in previous years.

In the proofs before the Board the applicant made no effort to establish a rate base or a reasonable rate of return as a premise for the projected rate increase. The county relied solely on its internal bookkeeping, reflecting only income and expenses and seeking to establish a loss in operation by virtue of the deduction of the disputed depreciation items, from which it argued that the rate increase imposed in January 1971 was reasonable. Furthermore, the county conceded that it was not conducting the operation for a profit but only to arrive at a break-even point between income and expenses.

It should be noted preliminarily that there was no evidence below relating to the projected life of the facilities involved to support the claimed figures for depreciation or amortization. The county merely selected 17 years for the land cost amortization because that was the life span of the bond issue, and selected a ten-year figure for the site preparation based on its own estimate of the useful life of the disposal sites.

The hearing examiner and the Board determined that the applicant's inclusion of an amortization item for the cost of acquisition of the Lyndhurst site was not a proper element of expense for the purpose of rate setting. The rationale underlying this conclusion is that land in itself is not a depreciating asset and that in this case the landfill operation will in fact transfer a "marsh condition to that of very valuable useable land which will appreciate in value over the years."

Appellant argues that this explanation for disallowance is not applicable to the Lyndhurst site because it has committed itself to dedicate the land for park purposes and that as a consequence it will realize no economic benefit at the terminaton of the landfill operation.

This argument is without merit. The methods of depreciation allowance dictated by commonly accepted accounting principles do not vary because of the owner's ultimate intended disposition of the asset. Whether the land will be used for public purposes or sold because the county has no need for the same is irrelevant to the issue at hand.

The Board's conclusion that the land will not depreciate is warranted regardless of the special intended use by the county.

In connection with the disallowance of the amortization of the site preparation costs as an annual expense item, the county points out that these costs were incurred because of the requirements of State agencies regulating the health and environmental impact of the waste disposal operation.

It was a necessary expense incurred to prepare the site for the conduct of the business thereon.

The Board counters that it is reasonable to capitalize such expenditure but that such an accounting procedure is only appropriate in developing figures for establishing a rate base. It is not permissible as an expense item in the manner offered by the applicant. And since the applicant did not make an effort to establish a rate base, its requested expense deduction was disallowed.

The major difficulty with the county's case is that it failed to utilize the standard method for seeking a rate increase by initially establishing a rate base as a foundation for a reasonable rate of return. *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12 (1974). As observed by Chief Justice Vanderbilt in *Public Service Coord. Transport v. State,* 5 *N. J.* 196, 217 (1950): "The determination of an adequate rate base is, as the term applies, fundamental in any rate proceeding."

In fact, the Legislature has established specific guidelines for special circumstances where the Board is not bound to find a rate base. *N. J. S. A.* 48:2-21.2. The proofs herein do not demonstrate that the county's case falls into one of the exceptions authorized by that statute. It is thus questionable whether the Board had the power to grant a rate increase without making a finding of a rate base as a *sine qua non* for relief. See *In re Industrial Sand Rates,* 125 *N. J. Super.* 48 (App. Div. 1973), aff'd 66 *N. J.* 12 (1974).[2]

Furthermore, we agree with the Board's interpretation of its own "Uniform System of Accounts for Solid Waste Collection and Disposal Utilities" and its conclusion that this system does not contemplate the amortization of costs of acquisition of real estate or site preparation as an expense item.

---

[2]In *In re Bridgewater Disposal Service,* unreported P.U.C. opinion —Docket #748-620 (1975), the Board, on the basis of an appropriate record, recently applied the classic rate base method to a case involving a private refuse disposal utility.

■ The county also urges as error the refusal of the Board to consider the rates charged by private operators of other refuse disposal sites as evidence of what should be the fair and reasonable rate to be applied to its operation. We agree that on the basis of the proofs before the Board it was justified within its discretionary power in rejecting the evidence of these rates as having little relevance to the determination of those reasonably appropriate to the applicant. See *N. J. Suburban Water Co. v. Bd. of Public Utility Comm'rs,* 122 *N. J. L.* 54, 56 (Sup. Ct.), aff'd 123 *N. J. L.* 303 (E. & A. 1939) ; *Public Service Coord. Transport v. State, supra,* 5 *N. J.* at 224.

The applicant offered no evidence showing the comparability of its operation with those whose higher rates were sought to be introduced. The bare offer of rates charged by others in the business can have little materiality to the basic issue for determination, namely, whether the county is entitled to a rate adjustment by virtue of the financial facts underlying its operation. Moreover, in the context of the regulation of a disposal site facility, rates of other operators who conduct a business for profit, and in an area of activity where there has been no experience history as a guide for comparison purposes, it would be meaningless for the Board to consider such other rates as a touchstone of reasonableness. In any event, it was within the discretion of the Board to accept or reject the evidence and on the basis of the record herein there was no abuse of that discretion.

■ Finally, we find ample credible evidence to support the conclusion below that the rates charged prior to January 1971 were reasonable and that an increase was not warranted. The Board determined that, with the exclusion of the two items of amortization, the revenues under the 1970 rates reflected an excess over proper expense items of approximately $112,000 projected for 1972 and that this sum would be more than sufficient to cover all expenses and the

debt service on the outstanding bonds, leaving a small operating profit.

■■ The decision of the Board on all issues brings into play its expertise in rate making developed from a background of vast experience with public utilities of various types. The Board is entrusted by the Legislature with broad power and discretion in the exercise of its rate making function. *Public Service Coord. Transport v. State, supra,* 5 *N. J.* 196. Its decision carries with it a presumption of correctness, with the court's function limited to a determination whether the record presents a reasonable basis for its action. *In re N. J. Power & Light Co.,* 9 *N. J.* 498, 508 (1952) ; *In re Greenville Bus Co.,* 17 *N. J.* 131, 137–138 (1954) ; *N. J. S. A.* 48 :2–46.

We find that the evidence before the Board amply supports its conclusion on the facts and the law, and we therefore affirm.

■ A question remains as to the disposition of the escrow funds from excess collections since January 1971. We are advised that there are pending applications for rate increase for 1972 and 1973 which have been delayed because of this litigation, and that the appropriate distribution of a portion of the escrow funds may depend upon the Board's determination of those applications. Under the circumstances we continue the order for the maintenance of the escrow account entered by this court in *Bergen Cty. v. Dept. of Public Util., supra,* and remand to the Board to determine the issue of distribution upon appropriate application by the county to be made within 30 days of the filing of this opinion.